Good morning, everyone. We're here for argument in the case of David Allen Rundle v. Ron Davis. When you're ready, counsel. Good morning. May it please the Court. I am Marsha Morrissey, and I represent David Allen Rundle. Lynn Coffin, who represented Mr. Rundle in the district court with me, also joins me at the counsel table. I hope to reserve five minutes for rebuttal. All right. I'll try to help you out, but keep your eye on the clock as well. Thank you. In this case, Your Honors, trial counsel did not provide the jury with the most important information that they needed to decide whether Petitioner should live or die for the crimes that he committed when he was just 21 years old. Petitioner testified that he was sexually abused by his mother. That was the linchpin of the defense at both the guilt and the penalty phases. The jury did not know critical information. They did not know that Petitioner's mother, Jane, was an incest victim herself. Her father used her as his wife from the age of 8 to 15 years. In court proceedings that followed the discovery of this, it was found that Jane was functioning at a low, at a dull, normal level, lacked awareness of the gravity of her behavior, and did not believe she had a problem to resolve. Jane was 17 and pregnant when she married 17-year-old David Rundle Sr., who was the son of a physically abusive father. They came to the marriage with incest and family violence models that followed in raising their own children. David disciplined by brute force, beatings with his closed fist. The family dog was so scared of David Sr. that it urinated when he entered the room. Numerous witnesses saw Petitioner throughout his life with his face bruised and swollen. Jane's behavior towards Petitioner shocked those who observed it. She was cruel and unleashed vicious rages on her children and on Petitioner in particular. One of Petitioner's friends, who did not testify, has said that Jane Rundle made Mommy Dearest look like June Cleaver. Her sexual abuse of her son was aggressive. She tied his hands behind his back during sex, just as hands... The jury heard Petitioner. The jury also heard Jane, who testified for the prosecution, deny any of the behavior that was reported by Petitioner, the incest, and they also heard her deny that she exposed herself. The problem is that Dr. Yarvis didn't know anything about incest. He was an expert in pedophilia. When he testified for the jury, he said, well, it's really rare, we don't know much about it. And he couldn't address it at all. He thought that he was called to be a general witness. I don't know what a general witness does, but he, without any reference to the facts of this case. So Dr. Yarvis was not adequate to do what they needed, what trial counsel needed to do. But you really didn't answer the question. I thought the question was very well put. Is it a matter of degree? Because the jury, the trial evidence that came before the jury could very easily imply the existence of all three of the issues which you suggest are very important that they be told about. And yet, I guess that's why the question was important. Is this a matter of degree? Is it a matter of the amount of time that they spent emphasizing it? Is it a matter of what? What is it you're really arguing? Because the reason I asked the question, I thought her question was very good. I said, if it's a matter of degree, I have a little bit of deference I have to give to counsel. And not only that, but I have a double deference I have to give to the California Supreme Court. I understand that, Your Honor. And our position is that the State court's finding of no ineffective assistance was objectively unreasonable. Well, I understand that's your position. Don't I owe a double deference to this finding? First of all, I owe a deference to the attorney. I can't just, say, give the benefit of the doubt to the attorney, but I have to entertain the range of possible reasons that the counsel would have had proceeding as they did. And then after that, which is, I think, a very big deference, I've got to come up with reasons he could have done it. He doesn't even have to come up with them. And then I have to say, and the California Supreme Court also had to do the same thing, and yet they didn't find it, and therefore they're wrong. And that means I have to say they were just, they had no way to come up with what they did. And that's why, if it's a matter of degree, I'm having a tough time with your argument. Well, it is, let me just back up. Trial counsel in this case recognized that Dr. Yarvis did more harm than good. The district court, in its opinion in this case, specifically found that Dr. Yarvis did more harm than good. In fact, what the district court said. You mean Dr. Thomas? You're talking Dr. Thomas? No, this is Dr. Yarvis. It was the claim that they found they failed to call a competent mental health expert. The district court found that Dr. Yarvis did as much harm as good, and the district court stated without a better mental health expert to explain to the jury how what happened to Petitioner could lead to significant mental issues. It is difficult to conceive that trial counsel's conduct could be considered objectively reasonable. I guess in addition to the double deference that Judge Smith mentioned, because of course this is an AEDPA case and we have to view it through that framework, the reason I focus on whether it's a question of degree is that I think your case is all about prejudice. You have to explain, because you raise a lot of different issues here. For example, Dr. Thomas, I don't see how he was particularly helpful to the defense, and so there may be issues here and there. But the heart of your claim is the horrific childhood that Mr. Rundle experienced and how that could humanize him. And so if the jury heard evidence of a lot of that, albeit not to the level or degree that is ideal in the defense's view now on appeal, we still have to get to the question of prejudice. Yes. And the prejudice I think I can address, Your Honor. The need for a competent expert was so acute in this case that one of the detectives who arrested my client, Detective Sue Coffey, told, gave the investigator on the case the name of Nicholas Groth, Ph.D., whom she knew from her work with law enforcement on sexual abuse cases. And they said, You need him. They never followed up. Dr. Groth, who was an expert, was never contacted. Now, there is no finding, there's no basis in this case for finding that the evidence the trial counsel did not present would have invited an avalanche of rebuttal at penalty phase. There's no facts in the case indicating that this would devolve into a battle of experts. And I don't believe, to address the prejudice, that given the seven distinct things that the district court found were wrong, and they're very particular and it was a well-reasoned decision, but given those seven things, I think no reasonable fair-minded jurist could fail to find the Petitioner was prejudiced by these serious errors. In this case, the charged offenses were grave, absolutely. And there was serious aggravating evidence that required equally substantial mitigation that was readily available, but the trial counsel failed to present. But the problem comes with that argument that even though the district court did what it could to help you with the, if you will, the prong of deficient performance, the district court said there's no prejudice. Yes, and we . . . And to be fair, the district court did its best it could with what we had in front of it to say there was deficient performance, even given the standard that I put to you. And then after doing that, said there's no prejudice. Well, and . . . So how do I argue there's no fair-minded juror? Well . . . I mean, it seems to me that's the absolute good evidence there's a fair-minded juror. I understand the Court's point, but on the other hand, if all it took was one judge or jurist to say there's no prejudice and that was the end of the inquiry, we wouldn't be here. There would be no need for any of this. The great writ would be eviscerated. And I don't think that that's what the Supreme Court had in mind when it decided Cohen v. Pinholster. I think that the Supreme Court . . . Well, how would you read Cohen v. Pinholster? Well, I read it differently. I mean, to be fair, to be fair, I'm reading it exactly as we've read it ever since it came down. Well, maybe I'm an internal optimist, but I see Cohen . . . So what you're suggesting to me, that I have to undo what we've said it says . . . No. . . . in order to make your case? No. I think we should look at Pinholster and see what the Court did there, because they — it was decided based on the following things. The Court said there was — the district court considered two experts that were not presented to the State court. So we have to exclude them. That was wrong. So that's a difference between this case. Everything that we presented to this court was presented to the State court. In Pinholster, in assessing the reasonableness of counsel's conduct, the Supreme Court described Pinholster as an unsympathetic client who limited feasible mitigation strategy by guilt-faced testimony. He boasted of his crimes. He said he was a professional robber. He was a white supremacist. He had done, you know, hundreds of robberies. And given that testimony, the Court said it was a reasonable strategy to focus on evoking sympathy for his mother, because there was nothing sympathetic about the client. There is no basis for a finding in this case that nothing else could have been done. There was also a finding that the Supreme Court said, well, the evidence that trial counsel didn't present was largely duplicated. It duplicated the mitigation that was pre-presented at trial. So there was, you know, no new evidence that was involved in Pinholster. And the Court finally said that if mitigation evidence had been pre-presented as urged by post-conviction counsel, it would have opened the door to rebuttal. There is in this case no allegation that there was damaging evidence that could have been presented had trial counsel performed adequately. So the evidence that the prosecution presented at guilt and penalty phase could have been mitigated by Petitioner's horrific childhood. And, Your Honors, this was explanatory mitigation. It was not a bare plea from mercy. It was not humanizing. It was explanatory. In Porter v. McCollum, the Supreme Court considered a case where the defendant was convicted of killing his former girlfriend and her boyfriend, and the Court noted that it is unreasonable to discount to irrelevance evidence of Petitioner's abusive childhood, especially when that kind of history may have had particular salience for a jury evaluating Porter's behavior in his relationship with his girlfriend. In this case, the effects of maternal incest on Petitioner would have had particular salience to the jury in evaluating the penalty to be imposed for his crimes. This Court has said in Wharton v. Chappell that childhood sexual abuse can be powerful evidence in mitigation, particularly when it is not an isolated event. The same is true here. This was not isolated. And the sexual abuse that Petitioner suffered at the hands of his mother is inextricably tied to the crimes for which he was tried and convicted. In Wharton, this Court said that a juror might have seen aggravating evidence about a prior murder that was committed by the defendant as stemming from repressed anger about the homosexual rapes of Petitioner by his father and step-grandfather. And this Court also ---- Sotomayor, I go back, counsel, to the mitigation case that actually was presented, because this is not a situation where counsel failed to present a mitigation case or the mitigation case had some big gap that now, on post-conviction relief, you're saying should have been filled. And so, as I recall it from the record, during the guilt phase, Rundle himself testified to the extensive sexual abuse that he suffered starting from a young age at the hands of his mother. At the penalty phase, his defense counsel presented relatives, an aunt and an uncle, who corroborated those claims and talked about his sexual abuse. Wasn't counsel, based on the evidence that was already presented, able to argue at closing argument of the effect that the abuse had on him? So, in other words, if that case was there for counsel to piece together at closing argument during the penalty phase, what is this now new evidence going to do that counsel didn't have the opportunity to do from the case that was presented? Your Honor, my view of the evidence at penalty phase was that it failed utterly to corroborate my client's testimony at guilt phase. Throughout the case, the prosecutor called him a liar, repeatedly, both stages. So that the corroboration that was presented was testimony about Mr. Russell and his wife, Bonnie May, I believe, who said that when Petitioner was an infant, they noticed chafing on his genitals, and they said to his mother, something's going on here, it should stop. But we're talking about a lifetime of not chafing, but, you know, actual sex with a child. I submit to the Court that George Russell corroborated nothing, and that the case against their client, it was based – well, their defense was based solely on their client's testimony, and it wasn't corroborated at all, and it was a disaster. What corroboration is there now that wasn't presented? There is corroboration in the form of expert testimony by people who know this. There is corroboration in the form of one of Petitioner's friends, who was a few years older than him. He told this man that his mother had been molesting him since he was a child, and he said that he wanted to get his younger brother out of the house because he felt it was going to happen to him. Now, that's the name of this witness? George Minor, I believe. Let me double-check. Oh, no, he wasn't. It was George Minor. And so he – that is – that would have laid low all the prosecutor's complaints about this is fabricated, this is nothing but fabrication. There was also testimony that could have been presented by Janet Thornall. Janet Thornall was married to one of Petitioner's brothers, and she said that they held family meetings behind locked doors that lasted for hours. And when Janet asked her husband what went on in this case, what was going on, he said abuse. Janet Thornall could have testified that one of Petitioner's little brothers exposed himself to her and asked if she wanted to play with his penis. And when she said no, the brother said, my mama likes to. That is corroboration. That is somebody other than Petitioner who would be able to establish what happened and lend their client some credibility. This is not an area, it's mother-son incest. It's not an area like PTSD where everybody has kind of a fund of knowledge to draw on. This is something that needs expert testimony, and that's what the district court found. Going back to the prejudice, in Wharton, aggravating evidence was a prior murder and the rape of a 61-year-old woman by a much younger Petitioner. This Court found that a juror may have seen the prior rape as stemming from a childhood filled with rape and sexual abuse across generations, committed with impunity. That's what the mitigation that trial counsel failed to present would have done in this case. And the prior murder, again, the Court said, would have been mitigated by evidence that Petitioner was repeatedly raped by his father and a step-grandfather during his life. A juror in this case might have seen the crime as stemming from the incestuous acts of Jane, accompanied by force, the binding of hands, and the parallels between the crimes in which each of the victims was found with her hands tied behind her back, and what happened to Petitioner is undeniable. In Doe v. Ayers, this Court noted that the causal nexus between the mitigation evidence that the defendant had been sexually, let me back up, the Court noted the importance of a causal nexus between sexual abuse and the crimes. And the Court stated that evidence of sexual victimization would have offered the jurors a way to understand, though not, of course, to justify, Doe's aggression as a product of repeated brutalization that left him suffering with PTSD. But it's my understanding that the defense counsel attempted to introduce records of Jane's father's abuse. Yes. And the Court did not allow the introduction. What happened, Your Honor, is that this was an attempt to, they attempted to introduce the records at guilt phase. The Court ruled that because there was no testimony, that people who are sexually abused tend to commit offenses of a sexual, sexually abusive nature, there was no, there was no showing of relevance. But by penalty phase, there was a showing. There was testimony that there was an undeniable connection between being a victim of sex offenses. But just a minute. They argued, didn't they, that Dr. Yarvis' testimony provided the sufficient link? They did. And didn't Yarvis testify that there were certainly, appears to be, and I quote, some evidence or sexually abuse has a greater likelihood to inflict similar abuse on their child than a parent who has not been so affected, but how much more likely is not clearly shown? I mean, it seems to me that they've made the argument and the judge rejected it. Well, they either didn't know what was in the record and couldn't point it out to the judge, but in any event, at penalty phase where there is a relaxed standard, where they had all of the guilt phase testimony in front of them, trial counsel did not reoffer those records. Well, how reasonable is it for a court to conclude that counsel should have acted differently than in raising it again? I mean, if the court's already said, no way, we're not letting this in, there's no evidence of this. So I guess it's hard for me to say the California Supreme Court would be unreasonable in concluding that counsel could have acted differently in raising this issue. Well, there's kind of a number of layers involved here. Well, I know, but the reason there are a number of layers is because there's double deference. Right. Well, there's a number of layers because you can one can take, strongly take issue with the ruling of the trial court. Well, I understand that, but we can't do that at this point. Right. And one can take issue with counsel's failure to renew the motion to get those records in. Well, one can take, but now that was the question I presented to you. Why would a court say it was unreasonable for counsel to have not done that when he lost before? And why then would I say that court was wrong in thinking that it wasn't unreasonable? That's my question. Well, we're getting back to Cullen, and here we go. But I, you know, and I stand by my... I know you stand by your thing. I stand by my attempt. What I'm trying to do, all I'm trying to do is see, I'm trying to make you, ask you to see it from the way I see it and then make your argument, because I've got to see it that way. Yes. And I am doing my best. Okay. Given the, you know, the deference issue. But the jurors in this case were not offered a way to show that Petitioner's use of women was the product of his own victimization. And that's what they had to do. That in order to mitigate in any sense these crimes, the jurors had to understand they did not, Your Honor. I don't want to interrupt you, but I know you wanted to save some time. So if you want to save that time. I do want to save some time, and I'm eating into it. Thank you very much. Good morning, Your Honors. David Andrew Eldridge, Deputy Attorney General for Respondent. There is one, there is at least one logical problem that's immediate, and that is when you're trying to say that past abuse by a woman caused Petitioner to act out against women, you have nothing to mitigate the fact that he also molested a little boy. And there's simply no theory that they have that somehow accounts for that. That largely seems to be ignored. And that's going to undercut any theory that the reason he molested women is because he was molested by his mother, assuming that occurred at all. So that's going to drive a big hole in it, and it's not going to be very persuasive when there's no explanation of why did he molest little boys if he's got a problem with women. Well, it would seem to me that the argument would be that this is so traumatic to him, but what his mother did to him, that he was just, my words, I'm not a doctor, he was just completely messed up. And the distinctions you're making right now simply don't work in his head. I assume that's what their response to that would be. But there's no expert saying that, Your Honor. And we are purporting to understand from experts all of this. As to, and I'll distinguish between whether incest occurred versus expert theories as to what would happen if it had occurred. The only person who could say that Petitioner was molested was Petitioner. We pointed out in the brief, and it seems to just be ignored, that experts cannot say that someone is credible in their account of that something occurred. The California law is crystal clear, so all of the proper testimony that somehow these experts could prove it occurred is just wrong. There's not a single case cited that somehow they can do that in California. I think what counsel was talking about is the degree of corroboration, right? Because he testified and obviously the juror would look at him and he's got everything to lose and may not deem him to be credible. So there were bits of corroboration in the record that was presented. But there were, from counsel's argument, more powerful witnesses who could have been called at the penalty phase, who could have corroborated the fact that this longstanding abuse did occur. And so when I asked counsel for the example, she came up with his brother, I think it was Donald's ex-wife Janet, who lived in the home, had witnessed these closed-door secret meetings and could testify to what the brother said about what was occurring during the secret meetings, because apparently the abuse not only occurred to Mr. Rundle, but his brothers as well. That's pretty powerful corroborating evidence, right? That's rank hearsay, Your Honor. She wasn't there. She doesn't know what went on in the meetings. And from everything you see, the brothers are denying that that occurred. So, yes, she could have taken a stand and said, he said that, and the brothers would have denied it. The defense counsel looked into the brothers. One of them was unbelievably hot. She could testify to the fact that these boys were in the room with the door locked during these meetings. And that really doesn't say... That's from personal observation, right? Sure, but that really doesn't, assuming she saw it, but that really doesn't establish that abuse, whatever that means, occurred. And, again, we don't know what abuse means in that state. She does not say sexual abuse. She really couldn't. And the record is replete with at least allegations that there was horrific abuse apart from the idea of sex. So she does not know. She cannot say this occurred. Only if one assumes that it did occur do you start thinking, oh, that's what she must have meant. And there was no reason for counsel to think that the jurors would think that. The one evidence, bit of evidence, that we conceded appears to at least prima facie exist was a statement by Mike Godwin, which is the only one apparently prior to Petitioner realizing that he needs some story to explain himself because he's been caught, is from Mr. Godwin, who says that he would have at least prior to arrest that Petitioner said it. But, of course, we know why they didn't go looking for Mr. Godwin. Petitioner said he never told anyone. Also, even if, Your Honor, you could say that there was substantial evidence that the mother molested another child, that would also be excluded. That would be propensity evidence. You can't show someone engaged in misconduct in one instance to try to prove they did it in another. So there's a flat inadmissibility of evidence problem which explains why counsel wouldn't have done this. As to, first factually, whether counsel admitted evidence that the mother was molested, I will point out that there was evidence that came in. It wasn't the records of the father's conviction or Petitioner's grandfather, but at Supplemental Excerpt 70607, Dr. Thomas testified that the mother told him that she was molested, which was largely uncontested. In fact, I don't think it was contested at all. So insofar as that's an important fact that they think the jury should know, they did know it. But it seems to me, as long as you bring up Dr. Thomas, how would it have been reasonable for the California Supreme Court to suggest that defense counsel should have called Dr. Thomas as a defense witness? What did they gain by that? I mean, the honest truth is the state had already tried to put Dr. Thomas on. They had kept Dr. Thomas off, so the state had made a promise to the jury they couldn't keep. The kind of things that Dr. Thomas thought about the defendant were absolutely atrocious. What would have ever been the rationale to put him on? Dr. Thomas, in fact, was the most relevant witness. Most relevant about what? About defendant's childhood. He was the one who treated defendant in his childhood. But what did he say that was helpful to the defense? The defendant didn't get the help he needed at YSC. He said the parents weren't going to take the counseling very seriously. He said that because petitioner went home instead of staying at the YSC, he didn't get the help he needed. When they claim, as they have, that there was institutional failure, Dr. Thomas was the one who was most knowledgeable about whether the institution had failed the petitioner. When you're looking to put off blame for something someone did and you want to say this could have been avoided had he got the treatment he needed, the ideal person to call is a person who was there at the time, during childhood, and responsible for the treatment. And that's what Dr. Thomas said. And Dr. Thomas saying, I think he was going to... Did Dr. Thomas testify that this likely wouldn't happen if he'd gotten the help he needed? No. No, no, no. But that is their defense. That is the defense of institutional failure, which is one of the things that they claimed, that counsel should have presented evidence of institutional failure. That's what Dr. Thomas does. He presents evidence of institutional failure by saying he didn't get what he needed at the institution. Are you suggesting... Now, I'm going to take a different approach to this. Are you suggesting when Dr. Thomas had already made it clear to counsel beforehand that he had strong negative feelings towards the defendant, stemming from the death, Fred, if nothing else, that there were no other doctors which were more favorable to Rundle's case that they could have called? Well, if you... When you say more favorable... I mean, you say there was favorable. I was having a tough time seeing what favor there was. But now you say there is. So I'm going to give you credit. What is there? No other doctor more favorable? Well, he is the doctor who doesn't know as much about what happened later. I mean, if you bring in a doctor, you hire one now at a trial, to learn all about Petitioner, and that doctor immerses himself in Petitioner's background, and that doctor then finds out, well, there's another victim Petitioner had, which as part of his life story may well come out during cross-examination, and the jury is going to find they don't even know all the victims yet, because it turns out there's another one he abducted at age 14, a grown woman he intended to rape. You also find out that he didn't know what to do at the time at 14, despite claims that he's been having vaginal intercourse for the last five years. He rapes...he abducts a woman, intends to rape her, but then, quote, doesn't know what to do. That suggests he's lying about having sex for the last five years. And as I point out, that was... The claim of incest was their hook. If...even something that had any substantial chance of showing that that was a lie, counsel decided, I have to avoid that at all costs, because without that we simply have nothing. He's got...he's raped and murdered three women. Worse than that, she mentioned Penholster and how that client was unsympathetic. Petitioner was unsympathetic because the thing he told his former girlfriend, Heather, was he had a good thing going while it lasted, and it's too bad he got caught. A...a fair understanding is that he's sorry that he won't be able to rape and murder more women. That's horribly unsympathetic. And the more you learn...the more you learn about him, so to give an accurate assessment of him, the more you find out... There's a prior victim that the jury doesn't even know about, but they'll probably learn on cross-examination. So...so he's the only one that they could have called where that wouldn't have been subject to cross-exam? No, he was subject to cross-examination as well, but he... Well, I know he was, but not about that. Well, no, he didn't know that. I understand that, but you're saying there's no other... no other expert that could have been called that also didn't know about that, that wouldn't have been better than Dr. Thomas? I don't know of an expert... And the California Supreme Court, who determines whether or not you can present expert testimony, including what that expert would need to know in order to be reliable, may well have included, you can't bring in an expert, hide information from him, because you don't want it to come out on cross-examination, and then claim counsel had to do that. So, no, I'm not sure that anyone should have come in reporting to give a petitioner's life story and saying, here's what you really need to understand about a petitioner who doesn't learn what there is to know about a petitioner. In that, Dr. Thomas was almost uniquely qualified. Again, he was the only one with contemporaneous knowledge, and the harm that you say he presented, the jury already knew far worse than what Thomas said. So his saying, I think he... I thought he was going to go on to offend, well, the jury already knows that he did. That's awash at best. And what he does, what he is able to do is say, as the most knowledgeable person, this person didn't get the help he needed at an institution, which was for that purpose. Again, the... As pointed out, the mother did report, the jury did hear that the mother was molested, but also they heard it just is not predictive. Again, when you know someone is a molester, you perhaps... It is more likely that they were molested, but it just doesn't work the other way around. And, again, the comparisons between experts, Your Honor, why didn't they get a better one? I have to refer you to Hinton v. Alabama, where the United States Supreme Court says being able to review all of the qualifications of experts that were hired versus those that should have been hired. Counsel looked into it. Counsel is not supposed to be an expert on this. That's why he looks for an expert. And if an expert... But could they have hired an expert to testify about the causal nexus between being a victim of incest and acting out in these ways to help explain why he would have committed these crimes without having the doctor go into the details of what the defendant did or didn't do? Well, you can't... Well, they'll take the latter part first. You don't get to close off from a cross-examination things that are damaging. So, no, they can't necessarily... Assuming they could get a doctor up there at all, they can't limit cross-examination because bad things might come out. But Dr. Yarvis already said it would be devastating. No, I mean, if you hire an expert, do you have to have the expert delve into the defendant's particular background? Couldn't you just hire an expert to talk about the causal effect of or the impact of incest on somebody who then go on to commit serious crimes? Well, my understanding of expertise is that it isn't generally specific to a particular person. Because no... That's my point. That's my point, right? Because you're saying that Dr. Thomas had to be called because they couldn't have come up with another expert. So he was the one who can basically provide the context. He had information that was extremely damaging because the defendant, Mr. Rundle, didn't get the help that he needed. And he had opinions about Mr. Rundle that were extremely negative. And so in response to the questions that were asked of you today, you said, well, they couldn't have called any other expert. Dr. Thomas... So my question to you is, couldn't they have called an expert that would have provided the causal nexus between being a victim of incest and going on to commit serious sexual offenses  If you're saying purely in the abstract, could they say, if someone was, might they go on to... I don't know if I have a concrete answer for... Could someone say... Lots of experts out there. It's not at all uncommon we see from these records. Experts talk about the fact that if you're a victim of abuse, you go on to be an abuser. No. I'm sorry. The evidence here was quite to the contrary, Your Honor. That you cannot say that if you were abused, you go on to be an abuser. Counsel already knew from the expert he did consult that that's not true. So it isn't the case that if you are abused, you are more likely to be... That you more likely than not will be an abuser. Yes, there's some increase possibly, but it just is not true. That's, again, at 709, it's just not predictive. Rather, it's retro-predictive in the sense that if it turns out you are a molester, then we can claim that you probably were molested. But that's utterly different than saying that the causal link of if you were molested, you go on to. They tried to present that. They couldn't. They couldn't show that to the judge. So, no. It seems the evidence in this case is to the contrary. And if the question is shouldn't they have then looked for an expert who would say that, the answer is no as well. When you give an opinion you don't think is particularly favorable from an expert, you don't have a duty to keep looking for more experts until you find one that is favorable. And, again, Dr. Yarbus did testify that if Petitioner had been abused, he would expect the results to be utterly devastating and that a boy who was molested by his mother was more likely to even become psychotic than a girl who was molested by her father. The only trouble was that he said, yeah, more likely, but he isn't. Correct? That's correct. And, again, part of the problem with that is the expert you consulted doesn't have an opinion as favorable as you would like. But counsel doesn't have a duty to keep looking for more favorable opinions from experts. Counsel can credit the testimony or the opinion of the expert he consulted. Why not call Jackman? Well, first that would require looking for Jackman. And, again, he already had an expert and he was, it is proper for counsel to trust the experts that they consult. It would be one thing if he talked to an expert who says, I really can't give you anything useful, you need to go talk to someone else. That might really suggest, okay, I don't have the expertise that there is on this subject or I haven't consulted with it. But counsel doesn't learn to be an expert in law school. He consults with experts and it's up to them to tell him if he needs to go talk to yet another expert because they don't have sufficient expertise. We don't have any evidence of just all who he consulted with. Again, while a few things have been revealed, we don't know, we don't have counsel's file, the California Supreme Court didn't have it and they were sitting in the position of knowing, we don't know all the people that counsel may have consulted with. Would he have been better if Dr. Thomas had not been called at all? Well, no, then he wouldn't have had the evidence of, again, whatever negative opinions Dr. Thomas had, based on simply childhood experience, the jury already knew. So this idea that he was harmful is one that the California Supreme Court could find untrue. Because, again, they already knew all the things about Petitioner that supposedly were harmful. What he did provide that was helpful was evidence of institutional failure. And here you've got to blame someone else. And as much as you'd like to, as much as they might like to say, well, you blame the mother, honestly, all they really have on that is Petitioner's statement that it happened. Did defense counsel argue institutional failure below, during the penalty phase? I believe he, I believe, yes. We have the District Court's recital of it that we quoted in the brief. I believe he did. And he also, but I don't think the, I don't think he emphasized that too much. Because, again, you may have, you may have a backlash when you try to simply blame everyone else. Rather, he also emphasized that Petitioner wasn't always a danger to everyone. He could work hard. There were people who liked him. Humanizing elements. So I don't think he tried to make that the end all and be all. But there was nothing wrong with adding that as part of the mix, Your Honor. And again, Dr. Thomas was the best qualified to state that because he was there. He was the one who knew Petitioner the most, rather than someone being called only after Petitioner was on trial.  I have no further questions. Thank you, Your Honor. All right, thank you very much. I think you've got a few minutes left for rebuttal. Thank you. I'll talk fast. Your Honor's counsel's file, just briefly, we've never had fact development in any court in this case. Respondent has opposed fact development. And if we had, we may have produced the file. But, you know, that's a nonissue for counsel to complain that we haven't produced the file when he has steadfastly urged that we not get an opportunity for fact development is questionable. Institutional failure was not presented at the trial to the jurors. Trial counsel had perfectly. Well, evidence was presented that the jury, Russell, was at a treating facility, right? I'm sorry, Your Honor, I didn't hear. It was that Rundle was at a treating facility. He knew that, right? The jury knew that he went to YSC. They did not know that YSC was not equipped to deal with anybody. They knew that David Sr. had abused him, right? I don't know that that was ever a tremendous focus, David Sr.'s abuse. That Jane abused him, right? That who? Jane. No, they didn't know that. In fact, one of the things. Well, he said that they did, right? Yeah, they did, but they did not know that. In fact, Dr. Thomas. That Rundle abused other children, right? The jury knew that? Yes. Okay, yes, the jury knew that. And that he was sent to YSC, right? They knew that, yes. So then why wouldn't the jury have connected the dots that society or the institution didn't solve his issues? Well, because it was portrayed by the prosecutor as though Mr. Rundle squandered this chance to be rehabilitated, that he didn't take advantage of the facilities at YSC when we know that there was no ability to treat him. Dr. Ackley, we have, you know, affidavits from people that worked there at the time. Dr. Thomas, by the way, who counsel indicated that Jane said she was molested to Dr. Thomas, well, Dr. Thomas testified that he believed that she was just making an excuse for her son. So he not only discounted what she said and didn't take it seriously, but he thought that it was some attempt to fabricate. Your Honors, there were standards in existence at the time of this trial. ABA standards, the 1989 ABA Guideline 11.4.1 was in effect, and that concerned investigation. At the time of this trial, the same year, this was the same year as the trial in Wiggins v. Smith, where the Supreme Court reversed for ineffective assistance of counsel. It was a trial in 1989. There are standards. There were standards. The Supreme Court has recognized that there were standards at that time. Porter v. McCollum that I referred to, that was a case that was tried in 1988. There were standards. The Supreme Court recognized them. And under those standards, counsel was totally ineffective. In this case, Your Honor, trial counsel, to change the result, had to change the mind of one juror, just one juror. We believe that it is reasonably likely that had the jury learned about the evidence, learned that Petitioner not only didn't take advantage, Petitioner tried to stay at YSC. Every time he got up for release, he would commit a new offense. As horrible as YSC was, he did not want to go home. So that if we could convince one juror, one juror with this mitigating evidence, there's a reasonable likelihood of a different result in this case. And I believe that under the standards, under the law, even under Collin v. Pinholster, this Court should grant Mr. Rundle relief, or at least an evidentiary hearing, so that we can develop these facts. Thank you. Thank you very much, counsel. Thank you to both sides for your argument in this case. We're in recess. All rise.
judges: N.R. Smith, Nguyen, Owens